# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LINDA LEE KREITER,          )
                                  )
            Plaintiff,        )
        v.                    )      Civil Action No. 09-0978
                                  )
MICHAEL J. ASTRUE, COMMISSIONER   )
OF SOCIAL SECURITY,        )
                                  )
           Defendant.     )

## MEMORANDUM OPINION

## I.      INTRODUCTION

Plaintiff Linda Lee Kreiter ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g) and §1383(c)(3), seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act. The parties have filed cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the record has been developed at the administrative level. (Docket Nos. [8], [13]). For the following reasons, the decision of the ALJ is not supported by substantial evidence and, therefore, the case is remanded for further administrative proceedings.

## II.      PROCEDURAL HISTORY

Plaintiff protectively filed her application for SSI on March 21, 2006, alleging disability since January 1, 2006 due to bipolar disorder, arthritis in the back, depression, and

panic attacks.[1] (R. 96-101, 122). Plaintiff's claim was denied at the initial level on September 12, 2006. (R. 77-81). She requested a hearing before an Administrative Law Judge ("ALJ") on November 8, 2006. (R. 83). A hearing was held on April 30, 2008. (R. 26-61). Plaintiff, who was represented by counsel, and Plaintiff's social worker appeared and testified at the hearing. *Id*. Tanya Shuloh, a vocational expert, also testified. *Id*. On June 24, 2008, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. (R. 67-76). The Appeals Council subsequently denied Plaintiff's request for review, thereby making the decision of the Commissioner final in this case. (R. 1-3). Plaintiff now seeks review of that decision by this Court.

## III. STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 522, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). As long as the Commissioner's decision is supported by substantial evidence, it

---

[1] Citations to Docket No. 5, the record below, are hereinafter in the form: "(R. ___)."

2

cannot be set aside, even if this court "would have decided the factual inquiry differently." *Haranft v. Apfel,* 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents [her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Sec'y of Health and Human Servs.,* 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. §423 (d)(1). A claimant is considered unable to engage in substantial gainful activity "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §423 (d)(2)(A).

An ALJ must do more than simply state factual conclusions to support his ultimate findings. *Baerga v. Richardson,* 500 F.2d 309, 312-13 (3d Cir. 1974). The ALJ must make specific findings of fact. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983). Moreover, the ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its rule making authority under 42 U.S.C. §405(a), has promulgated a five-step sequential evaluation process to determine whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520 (b), 416.920 (b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [20 C.F.R.] §§ 404.1520(c), 415.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [20 C.F.R.] §§ 404.1520(d), 416.920(d).  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. [20 C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-5, 124 S.Ct. 176, 157 L.Ed. 2d 333 (2003)(footnotes omitted).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiff's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Campbell*, 461 U.S. at 461; *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d 775, 777 (3d Cir. 1987); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## IV. FACTS

4

### A.    General Background

Plaintiff was born on October 14, 1960, making her forty-eight years of age at the time of the ALJ's decision. (R. 117). A forty-eight year old is considered a "younger person" under 20 C.F.R. § 416.920(c). Plaintiff completed the tenth grade, had training in cosmetology and is able to communicate in English. (R. 128). Plaintiff had previously been employed as a resident's aide for three months. (R. 123). Plaintiff avers January 1, 1996 as the onset of her disability. (R. 117).

### B.    Medical Background

Plaintiff claims to be disabled due to bipolar disorder, arthritis in her back, depression, and panic attacks. (R. 122).  Plaintiff had two psychiatric hospitalizations in Illinois, once in 1995 and once in 1997, at which time she was diagnosed with bipolar disorder. (R. 154-155).[2]

Plaintiff began treating with Dr. Gregory Dischman, a primary care physician, on August 24, 2004. (R. 316). Plaintiff reported suffering from gastroesophageal reflux disease (GERD) for which she had previously treated with Prevacid; lower back pain for which she had previously treated with Arthotec; and bipolar disorder for which she had previously treated with Dr. Levine who prescribed Wellbutrin and Depakote.[3] *Id*. Plaintiff expressed concerns about

---

[2]

    Reference was made in many of Plaintiff's records to these two hospitalizations, but records of the hospitalizations are not contained in the administrative record.

[3]

    Wellbutrin is an antidepressant used to treat depression. National Institutes of Health/U.S. National Library of Medicine, "Wellbutrin," *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html (last visited March 22, 2010). Depakote is an anti-convulsant used to treat mania in people with bipolar disorder.

(continued...)

having sleep apnea.  Dr. Dischman prescribed Prevacid for GERD, Arthotec for back pain, encouraged weight loss for obesity, and ordered a sleep study. (R. 317).

On September 9, 2004, Plaintiff had a follow-up with Dr. Dischman with complaints of back pain, wheezing, and fatigue. (R. 315). Plaintiff's maxillary sinuses were tender upon examination. Plaintiff was placed on Allegra[4], Advair[5], and Albuterol[6] for allergies and asthma and given Feldene for back pain. *Id*. It was recommended that she have a sleep study performed. *Id*. Plaintiff was next examined by Dr. Dischman on October 5, 2004 for continued problems with wheezing and asthma. (R. 314). Wheezing was noted on examination. Dr. Dischman assessed asthma and bronchitis and continued Albuterol. *Id*.

---

[3] (...continued)
National Institutes of Health/U.S. National Library of Medicine, "Depakote," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html (last visited March 22, 2010).

[4]

Allegra is used to relieve the allergy symptoms of seasonal allergic rhinitis. National Institutes of Health/U.S. National Library of Medicine, "Allegra," *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601053.html (last visited March 22, 2010).

[5]

Advair is used to prevent wheezing, shortness of breath, and breathing difficulties caused by asthma and chronic obstructive pulmonary disease.  National Institutes of Health/U.S. National Library of Medicine, "Advair," *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699063.html (last visited March 22, 2010).

[6]

Albuterol is used to prevent wheezing, difficulty breathing, chest tightness, and coughing in people with chronic obstructive pulmonary disease. National Institutes of Health/U.S. National Library of Medicine, "Albuterol," *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601063.html (last visited March 22, 2010).

Plaintiff was involuntarily committed to Butler Memorial Hospital on October 7, 2004 pursuant to a petition filed by a man claiming to be her Amish cousin. (R. 218). Plaintiff reported moving to Pennsylvania after a breakup with her spouse to experience the Amish way of life. *Id*. Her cousin stated that she had been doing well and was active in church, but then began displaying very aggressive mood outbursts, anger, problems with jealousy, extreme lack of personal grooming and hygiene, abuse of prescription medications, and had fallen asleep on several occasions with a cigarette in hand and a propane stove lit. *Id*. Plaintiff reported that, in the past, she had experienced manic and depressed episodes, but was not experiencing episodes on admission. She did admit to prior hospitalizations, problems sleeping, sleeping with her cigarette lit, and treatment with various psychotropic medications in the past. *Id*. Plaintiff also reported significant emotional and physical abuse by her husband of eighteen years and her parents during childhood. She tested positive for opiates. (R. 218-219).

According to a mental status examination at admission, Plaintiff's mood was low with congruent affect, speech was spontaneous, speech content was positive for psychosocial stressors, and insight and judgment were limited. Dr. Hari Vemulapalli, a hospital psychiatrist, diagnosed mood disorder, NOS (not otherwise specified); history of bipolar disorder; and history of anxiety disorder. General medical conditions were noted as significant obesity, gastroesophageal reflux disease, hypertension, and sleep apnea. (R. 219). Psychosocial stressors were reported as moderate and a Global Assessment of Functioning ("GAF") of 35 was assessed.[7] *Id*.

---

[7]

The Global Assessment of Functioning Scale ("GAF") assesses an individual's
(continued...)

7

A medical evaluation revealed acute bronchitis with cough and associated shortness of breath and edema was noted in the extremities. (R. 220). Plaintiff was sent for a sleep study, which revealed significant sleep disordered breathing. (R. 222). Throughout her stay in the hospital, Plaintiff pressed for discharge so that she could return to Texas by bus. (R. 215-217). At discharge on October 12, 2004, the doctor noted mood disorder, NOS (not otherwise specified); gastroesphageal reflux disease; hypertension; and obstructive sleep apnea. *Id.* Psychosocial stressors were noted as moderate to severe with a GAF of between 35 and 45. *Id*. Follow-up was set up for her with a hospital in Texas. (R. 217).

Plaintiff was psychiatrically hospitalized at Armstrong County Memorial Hospital from November 28, 2004 to December 7, 2004 with increasing suicidal ideation due to her bipolar disorder. (R. 154-155). Upon admission, Plaintiff discussed her significant history of alcohol abuse, but denied current usage. (R. 159-161). She discussed being of Amish faith, which Dr. Joseph Soffietti noted as being problematic to follow-up because she did not utilize

---

[7](...continued)
psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest.   A GAF score of between 31-40 denotes "severe symptoms" with some impairment in reality testing or major impairments in several areas. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).  An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .;  of 20 "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . . ." *Id.*

electricity and insisted on her follow-up care being with an Amish counseling center. *Id*. Upon

examination, Plaintiff was depressed and described her mood as a three out of ten. *Id*. She

reported tearful spells, irritable spells, and panic attacks. Dr. Soffietti noted his impression as

bipolar disorder, depressed; non-adherence to outpatient treatment; mixed narcotics abuse and

dependence of alcohol (in remission); victim of domestic violence; and marital problems. *Id*.

He also reported histrionic personality traits[8] and severe psychosocial and environmental

problems with a GAF of 45-55. *Id.*  A consultation for physical problems was ordered. *Id*.

Plaintiff underwent a physical examination with Dr. Wesley Minteer while in the

hospital. Plaintiff reported bouts of asthma, her sleep apnea diagnosis from Butler Hospital, and

chronic intermittent low back pain. (R. 156-158). Her physical examination was normal. *Id*.

During her hospitalization, she was placed on Accupril[9], Advair, Albuterol, Protonix[10],

---

[8]

Histrionic personality disorder is one of a group of conditions called dramatic personality disorders. People with these disorders have intense, unstable emotions and distorted self-images. For people with histrionic personality disorder, their self-esteem depends on the approval of others and does not arise from a true feeling of self-worth. They have an overwhelming desire to be noticed, and often behave dramatically or inappropriately to get attention. Cleveland Clinic, "Histrionic Personality Disorder," *available at* http://my.clevelandclinic.org/disorders/Personality_Disorders/hic_Histrionic_Personality_Disorder.aspx (last visited March 19, 2010).

[9]

Accupril is used for the treatment of high blood pressure. National Institutes of Health/U.S. National Library of Medicine, "Accupril," available at: http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692026.html (last visited March 22, 2010).

[10]

Protonix is used to treat gastroesophageal reflux disease. National Institutes of Health/U.S. National Library of Medicine, "Protonix," *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601246.html (last visited March 22, 2010).

Remeron[11], and Depakote. She expressed concern that she had nowhere to go after her hospitalization because her "Amish cousin" had no electricity or running water. (R. 154-155). He repeatedly refused to bring her cigarettes during her hospitalization and she became very angry. *Id*. She finally was able to contact him and make arrangements for lodging. *Id*. At discharge, Dr. Soffetti noted Plaintiff's diagnoses as being the same as at intake with a GAF of 65. *Id*. She reported mood stabilization and denied homicidal and suicidal ideations, delusions, or hallucinations. *Id*.

As a follow-up to her hospitalization, Plaintiff was examined by Dr. Dischman on December 14, 2004. (R.  200). Plaintiff reported continued fatigue and little relief from using oxygen during sleep. *Id*. Upon examination, her mood was neutral and affect appropriate with denial of suicidal ideations, homicidal ideations or hallucinations. *Id*. A formal sleep study was ordered and Plaintiff was continued on Advair, Remeron, and Depakote. *Id*. A chest x-ray from December 2004 revealed no acute pulmonary disease. (R. 208). On March 3, 2005, a telephone follow-up with Plaintiff noted, "PT is on home $O_2$. (R. 199). She wants the DME company to pick this back up. She does not believe in being on oxygen and she does not want this machine in her house. It's just not what she believes in!" *Id*.

On March 28, 2005, Dr. Gregory Mortimer completed a physical functional capacity form after reviewing Plaintiff's medical records. (R. 170). He opined that she could lift and carry twenty pounds occasionally and ten pounds frequently; walk six hours in an eight-hour

---

[11]

Remeron is an antidepressant used to treat depression.  National Institutes of Health/U.S. National Library of Medicine, "Demeron," *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697009.html (last visited March 22, 2010).

workday; sit about six hours in an eight-hour workday; and was unlimited in her ability to push and pull. *Id*. He further opined that she could occasionally climb, stoop, balance, kneel, crouch, and crawl and needed to avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, gases, dusts, and poor ventilation. (R. 171, 173).

Dr. Roger Glover was requested to do a psychiatric review technique on April 25, 2005, but noted that there was insufficient evidence to complete the determination. (R. 179).

Plaintiff returned to Dr. Dischman on January 5, 2006 for complaints of numbness in her legs, depression, and frequent urination. (R. 198). Plaintiff had discontinued all medications and never underwent the ordered sleep study. *Id*. Her mood and affect were flat. Dr. Dischman reordered the sleep study and prescribed Nexium and Protonix for gastroesophageal reflux disease and recommended restarting Depakote for depression. *Id*. Dr. Dischman completed a form stating that Plaintiff was temporarily disabled from January 5, 2006 to January 6, 2007 due to bipolar disorder, depression, and asthma. (R. 232).

Plaintiff followed-up with Dr. Dischman on March 22, 2006 and continued to report problems with fatigue, tingling and pain in her legs and thighs, reflux, and excessive thirst and urination. (R. 197). Dr. Dischman recommended a new medication for her neuropathy and increased her Nexium for reflux. *Id*. Hyperglycemia was noted as the cause for Plaintiff's excessive thirst and urination and a sleep study was scheduled for the following day. *Id*. Plaintiff was also referred for a psychiatric evaluation. *Id*. Plaintiff underwent a sleep study on March 23, 2006. *Id*. Testing resulted in findings of severely disordered breathing and a CPAP was recommended. (R. 194-196).

Plaintiff was psychiatrically evaluated by Dr. Rodney Altman of the Irene Stacey Community Mental Health Center on June 23, 2006 for an increasing number of panic attacks. (R. 247-248). At the examination, Plaintiff reported being of an Amish Mennonite denomination and living in a mobile home, which she referred to as her church, with one other woman and a man known as the "Bishop." *Id.* The home had no electricity making it impossible for her to use her CPAP machine and she reported taking no medications for a significant period of time. *Id.* She reported her main symptoms as daytime sleepiness, fatigue, disturbed sleep, and panic symptoms of increased heart rate and lightheadedness. *Id.* Upon mental status examination, eye contact was fair; speech was normal; mood was in the low range with fatigued affect; suicidal and homicidal ideations were denied; concentration was fair; insight and judgment were considered marginal to mildly impaired; and reality testing was intact. *Id.* Dr. Altman assessed history of bipolar disorder, NOS; history of panic disorder with agoraphobia[12]; history of borderline personality disorder; psychosocial stressors; and a GAF of 50. Plaintiff was told to avoid all panicogenic substances and find suitable living arrangements to utilize her CPAP. (R. 247-249).

On July 26, 2006, Dr. Altman completed a mental functional capacity form indicating slight limitations in Plaintiff's ability to carry out short simple instructions and

---

[12] Agoraphobia is a type of anxiety disorder related to fear. With agoraphobia, individuals fear being in places where it may be difficult or embarrassing to get out quickly or where they may have a panic attack and cannot get help. Because of these fears, the individuals avoid places where they think they may have a panic attack or panic-like symptoms. Mayo Clinic, "Agorophobia," *available at* http://www.mayoclinic.com/print/agoraphobia/DS00894/DSECTION=all&METHOD=print (last visited March 19, 2010).

understand, remember, and carry out detailed directions. (R. 245-246). Moderate limitations were noted in her ability to understand and remember simple directions and carry out detailed instructions. *Id*. Marked limitations were reported in her ability to make judgments on simple work-related decisions; interact appropriately with the public; interact appropriately with supervisors and co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. *Id*.

Plaintiff had a follow-up with Dr. Dischman on June 29, 2006 for the continued treatment of sleep apnea, neuropathy, and GERD. (R. 310). Plaintiff reported continuing problems with fatigue and severe pain with tingling and numbness in her legs. *Id*. Pedal edema was noted on examination. *Id*. Dr. Dischman continued Plaintiff's CPAP and ordered testing for her leg pain. *Id*.

On August 18, 2006, the Social Security Administration requested that Dr. Roger Glover complete psychiatric review, but the doctor noted that there was insufficient evidence to complete the determination. (R. 250). On August 30, 2006, Dr. Dilip Kar completed a physical residual functional capacity assessment.  (R. 266). He opined that she could lift and carry twenty pounds occasionally and ten pounds frequently; walk two hours in an eight-hour workday; sit about six hours in an eight-hour workday; and was unlimited in her ability to push and pull. *Id*. He further opined that she could frequently stoop, kneel, crouch, and crawl; occasionally climb; and never balance. (R. 267).

Dr. Glover completed a mental residual functional capacity evaluation on September 5, 2006. (R. 271-272). Dr. Glover opined that Plaintiff was moderately limited in her ability to understand, carry out, and remember detailed directions; maintain attention and concentration

13

for extended periods of time; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers and peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. *Id*. He noted that Plaintiff suffered from Bipolar Disorder, NOS and substance abuse with mild restriction in activities of daily living, moderate limitations in maintaining social functioning and concentration, persistence and pace with no episodes of decompensation. (R. 285).

Plaintiff had a follow-up with Dr. Dischman on October 16, 2006 for complaints of lower extremity pain, trouble sleeping, and numbness in both legs. (R. 309). Edema in the extremities had diminished and palpable doppler pedal pulses were present; however, posterior tibial pulses were markedly diminished.  *Id.*  Dr. Dischman noted his impression as neuropathy, peripheral artery disease, and probable restless leg syndrome. *Id*. He suggested lower extremity arterial dopplers, cessation of smoking, and treatment with Relpax.[13] *Id*.

---

[13]

Replax is used for the treatment of migraine headache symptoms. National Institutes of Health/U.S. National Library of Medicine, "Relpax," *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603029.html (last visited March 22, 2010).

On March 21, 2007, Plaintiff underwent a second psychological consultation at the Irene Stacey Community Mental Health Center with Dr. Randon Simmons. (R. 296-297). Plaintiff presented neatly dressed in Amish clothing and reported that her current residence was with a woman and her children to whom she was serving as a nanny. *Id*. Plaintiff also reported that four years earlier, she had met an Amish man on the internet and moved to Pennsylvania to live with him. (R. 296-298). She admitted that the man had emotionally abused her and taken advantage of her financially while making her do most of the work at his home. *Id*. Although she was living elsewhere, the man continued to contact her and "play mind games with her." Her ex-husband and parents had also been abusive. *Id*. Upon mental status examination, Plaintiff was alert and oriented times three; had clear and well-organized thoughts; normal speech; flat affect; good eye contact; problems sleeping; and poor insight and judgment. *Id*. Dr. Simmons diagnosed major depressive disorder, recurrent, moderate; moderate to severe psychosocial stressors; and a GAF of 40. (R. 298). Dr. Simmons recommended treatment with Lexapro[14] and a continuation of outpatient therapy. *Id*.

Plaintiff had five medication management sessions at the Irene Stacey Mental Health Center between March 30, 2007 and May 6, 2008. During these sessions, Plaintiff reported issues with motivation and energy, low mood, and anxiety. (R. 299-303, 357).

## C.    Administrative Hearing

---

[14]

Lexapro is used for the treatment of depression and generalized anxiety disorder. National Institutes of Health/U.S. National Library of Medicine, "Lexapro," *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html (last visited March 22, 2010).

At the hearing, Plaintiff appeared with the assistance of counsel, Wesley Hamilton, Esq. (R. 26). Plaintiff testified that she was living with a woman whose children she helped babysit. (R. 31). She explained that she no longer had a driver's license and relied on her case manager/social worker to drive her to the store and to appointments. (R. 32). Plaintiff testified that she completed her sophomore year of high school and held one job for three or four months as a care aide. (R. 33-34). She said that she was receiving room and board for watching two children twelve to fourteen hours a week. (R. 34-35). She also stated that she cooked dinner for the family but would not eat with them because it was too difficult for her. (R. 36). When asked why she could not work, Plaintiff testified that she could not deal with other people or herself and would get panicky with wild disturbances. *Id*. Plaintiff reported going to Irene Stacey Medical Center twice a week for outpatient partial hospitalization treatment and taking Lexapro and Wellbutrin. She also slept with a CPAP. (R. 37-38). Plaintiff admitted that she had not always been compliant with her medications because they made her very tired. (R. 39). Plaintiff stated that she had experienced emotional and physical abuse by her husband and had left the Amish community. (R. 41). As to her physical problems, Plaintiff reported back pain, fatigue, limits on standing to fifteen minutes, and limits on walking to five minutes. (R. 44-47). With respect to her mental limitations, she reported four hospitalizations for depression, crying spells five times a week, panic attacks five times a week, problems being around other people, and issues with memory and concentration. (R. 47-52).

Plaintiff explained that a typical day consisted of waking up, having a cup of coffee, making breakfast for the children, getting the children out of bed, putting the children on the school bus, cleaning up the kitchen and children's area, making dinner, feeding the children,

cleaning up the kitchen, crocheting, reading, and "playing around on the internet." (R. 42). She

said that she saw one friend once or twice a month and would babysit his children. (R. 43). She

also has difficulty sleeping and frequent bathroom use at night. (R.44).

Plaintiff's case manager/social worker, Rachel Rake, also testified. She explained

that her job was to help Plaintiff access resources. (R. 53). Ms. Rake testified that Plaintiff had

problems relating to other people in her life and was being taken advantage of by the woman

with whom she lived as she was not being paid. She noted that Plaintiff could not assert herself

in situations of conflict and would often call her while having a panic attack due to conflicts

with other people. (R. 53-54). Ms. Rake also discussed helping Plaintiff with her social security

forms after she became very overwhelmed by the process. (R. 54). Ms. Rake reported that while

on a trip to Phipps Conservatory, Plaintiff stayed one hundred feet away from the other

individuals in the group and had difficulty walking and breathing. (R. 55-56). Ms. Rake opined

that Plaintiff could not be gainfully employed due to her problems interacting with other

people. (R. 56).

Following Plaintiff's testimony, the ALJ heard testimony from a vocational expert,

Tanya Shuloh.[15] (R. 57). The ALJ posed a hypothetical question to the vocational expert and

asked what work such a person could perform. (R. 58-59). The ALJ described a person who

was limited to light work in an environment that would not include dusts, fumes, or chemicals.

---

[15]   Plaintiff stipulated to Ms. Shuloh's professional qualifications during the hearing. (R.
57). Shuloh's C.V. states that she attained a Bachelors of Science in secondary education from
West Virginia University as well as a Masters in Foreign Languages and a Masters in
Rehabilitation Counseling. (R. 91). She is currently employed at vocational case manager at
Alternative Careers & Transitions, Inc. *Id*.

17

The work was to be simple with little decision-making, no interaction with the public, and occasional interaction with co-workers. (R. 59). The vocational expert testified that the hypothetical person could do the job of a router and a ticketer. (R. 59). The vocational expert further testified that these jobs exist in significant numbers in the national economy. *Id.* The vocational expert also testified that if the hypothetical individual had to leave the job-site on unscheduled breaks upon any interaction with co-workers, there would be no work available for the hypothetical individual. (R. 59-60).

## V.  DISCUSSION

The ALJ concluded that the Plaintiff was not disabled as defined by the Social Security Act. The ALJ reached this decision after applying the five step framework for analysis summarized in *Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

### A.      The Five Step Analysis

Under the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 21, 2006, the application date. (R. 69). At step two, the ALJ made no determination as to whether Plaintiff suffered from severe impairments under the standards set forth in 20 C.F.R. § 416.920 (c).  *Id*. In the third step, the ALJ determined that none of Plaintiff's medical impairments met or equaled any impairment listed in 20 C.F.R. Pt. Subpt. P, App. 1 (the "Listing of Impairments"). *Id.*

Next, the ALJ determined that Plaintiff's current residual functional capacity did not allow her to return to her past relevant work. (R. 75). Accordingly, at step four the ALJ made the following residual capacity assessment:

> After careful consideration of the entire record, I find that the
> claimant has the residual functional capacity to perform work at
> all exertional levels but the claimant is limited to performing
> simple, routine repetitive work involving little decision-making;
> she cannot perform work involving interaction with the public;
> she can have only occasional interaction with co-workers; and she
> cannot perform work involving extremes of dust, fumes, and
> chemicals.

 (R. 70). The ALJ further found that Plaintiff's medically determinable impairments could

reasonably be expected to produce the alleged symptoms, but that Plaintiff's statements

concerning the intensity, duration and limiting effects of these symptoms were not credible. (R.

71).

Finally, under step five, the ALJ determined that there were jobs existing in

significant numbers in the national economy that Plaintiff could have performed. (R. 75).

Accordingly, the ALJ found that a finding of "not disabled" was appropriate under the Social

Security Act. (R. 28).

### B.    Issue Before This Court

Plaintiff makes several arguments suggesting that the ALJ erred in his reasoning.

First, Plaintiff argues that the ALJ erred in his determination of Plaintiff's residual functional

capacity due to reliance on numerous factual errors and a failure to discuss the relevant medical

evidence. (Pl.'s Brief at 6-11). She also contends that the ALJ improperly disregarded the

opinions of her treating physician, Dr. Dischman, and treating psychologists, Dr. Altman and

Dr. Simmons. *Id.* at 11-13. Plaintiff argues that, due to the limited weight given the treaters'

reports and factual discrepancies, the ALJ improperly relied on an incomplete hypothetical

question. *Id.* at 13-14. Plaintiff further argues that the decision of the ALJ should be reversed

based on a subsequent decision of the Social Security Administration finding Plaintiff eligible

19

for SSI starting in June 2009.  To the contrary, the Defendant argues that the ALJ's

determination was supported by substantial evidence and should not be remanded based on a

subsequent decision of the SSA. (Def.'s Brief at 1-19).

> ### C.    Residual Functional Capacity Determination and Hypothetical Question

Plaintiff argues that the ALJ improperly determined her residual functional capacity,

which led to an incomplete hypothetical question being presented to the vocational expert.

Plaintiff specifically argues that the ALJ failed to discuss all of her hospitalizations and GAF

assessments from those hospitalizations; misrepresented her daily activities; improperly

rejected evidence based on the involvement of the Office of Vocational Rehabilitation; ignored

records of all of her physical impairments; and disregarded evidence based on his own lay

opinion . (Pl.'s Brief at 6-11).

"'Residual functional capacity'[RFC] is defined as that which an individual is still

able to do despite the limitations caused by his or her impairment(s).'"  *Burnett v. Comm'r of*

*Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1

(3d Cir. 1999)).  A claimant's RFC represents the most, not the least, that a person can do

despite his or her limitations.  *See Cooper v. Barnhart*, Civ. A. No. 06-2370, 2008 WL

2433194, at *2 n.4 (E.D.Pa., June 12, 2008) (citing 20 C.F.R. § 416.945(a)).  In determining a

person's RFC, an administrative law judge must consider all evidence of record. 20 C.F.R. §

416.920.  Although an administrative law judge can weigh the credibility of the evidence when

making a RFC determination, he or she must give some indication of the evidence which is

rejected and the reasons for doing so.  *Id.*   As the court stated in *Burnett*, "'[i]n the absence of

such an indication, the reviewing court cannot tell if significant probative evidence was not

credited or simply ignored.'"  *Id.* at 121 (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

In this Court's estimation, the ALJ erred in his assessment of Plaintiff's residual functional capacity due to serious factual errors and a failure to discuss a significant portion of the medical record. The first, and most glaring error, was in the ALJ's discussion of Plaintiff's hospitalizations and treatment for bipolar disorder and depression. The ALJ stated, "the only notable treatment that the claimant has received as far as any type of depression was a very brief hospitalization in December 2004" and "the only significant treatment that the claimant received ... apart from sporadic treatment at the Irene Stacey Mental Health Center .... was in the form of a brief emergency room visit in December 2004."  (R. 71, 72). In fact, Plaintiff was psychiatrically hospitalized twice, both for extended periods. Plaintiff's first Pennsylvania hospitalization occurred in October 2004 for a five-day period. (R. 215-217). Her commitment was involuntary due to reports of mood outbursts, anger, extreme lack of personal grooming and hygiene, abuse of prescription medications, and possible suicidal tendencies. (R. 218-219). The doctors noted issues related to mood disorder and assessed a GAF of 35 at admission, which is indicative of severe symptoms with some reality testing impairment or serious impairment in multiple areas. *Id*. None of these records were mentioned or discussed.

The "brief emergency room visit in December 2004" was in fact a ten-day psychiatric hospitalization at Armstrong Memorial Hospital due to increasing suicidal ideation. (R. 154-159). She was diagnosed with bipolar disorder, depressed; histrionic personality traits, and had severe psychosocial and environmental problems with a GAF of 45-55, indicative of moderate to severe symptoms. *Id*.  While in the hospital, she experienced problems with anger relating to

21

an abusive man with whom she was living. (R. 154-155). Following her discharge, she had

some follow-up with Dr. Dischman, her primary care physician. (R. 200). In January 2006, her

mood and affect were flat. She had discontinued her medications and also the use of her CPAP

machine. Dr. Dischman recommended restarting Depakote. (R. 198).

Plaintiff was referred for a psychiatric evaluation in March 2006. (R. 194-197). At

the evaluation in June 2006, Plaintiff reported experiencing an increasing number of panic

attacks. (R. 247-248, 296-298). She was then living in a mobile home, which she referred to as

her church, with a man she called the "Bishop." *Id*. Later records revealed that she had met the

man on the internet and was being emotionally and financially abused by him.  *Id*. Mood was

noted in the low range with fatigued affect. Insight and judgment were reported as marginal to

mildly impaired. (R. 247-248). Dr. Altman noted his impression as history of bipolar disorder,

NOS; history of panic disorder with agoraphobia; history of borderline personality disorder;

psychosocial stressors; and a GAF of 50, indicating severe symptoms. (R. 247).

Plaintiff was evaluated again one year later. She reported repeated abuse by her

parents, ex-husband, and the man she had met on the internet. (R. 53-54, 296-297). She noted

living with a woman and taking care of her children. *Id*. Her social worker later testified that the

woman was taking advantage of her by not paying her.  *Id*. Upon examination, Dr. Simmons

noted a flat affect, good eye contact, problems sleeping, and poor insight and judgment. (R.

296-298). Dr. Simmons diagnosed major depressive disorder, recurrent, moderate; moderate to

severe psychosocial stressors; and a GAF of 40. (R. 298). Five medication management

sessions were also present in the record from between March 30, 2007 to May 6, 2009 with

Plaintiff reporting low mood, issues with motivation and energy, and anxiety. (R. 299-303,

357). The cursory statements by the ALJ relating to Plaintiff's mental health treatment and hospitalizations were obviously conclusory and inaccurate.

The opinion was similarly deficient in its discussion of Plaintiff's physical problems and accompanying medical treatment. (R. 71-72) In his opinion, the ALJ summarized Plaintiff's treatment for physical ailments as follows: "the progress notes, as reflected in the records of Dr. Dischman, do not document that the claimant has any severe physical impairments." *Id*. The ALJ failed to discuss both of Plaintiff's sleep studies, one from October 2004 and one from March 2006, both of which indicated severely disordered breathing, or sleep apnea. (R. 194-196, 222). Plaintiff's treatment with a CPAP, on and off for most of the period between her first hospitalization and the date of the ALJ's opinion, was also ignored. Dr. Dischman's records also indicated treatment for GERD, low back pain, asthma, and peripheral vascular disease, characterized by severe leg pain, tingling and numbness in the legs, pedal edema, and markedly diminished posterior tibial pulses. (R. 156-158, 197, 198, 220, 309, 310, 314-315, 317). Consistent documentation of Plaintiff's obesity was also present, but discussion was absent from the opinion.[16] (R. 317); *see Diaz v. Commissioner*, 577 F.3d 500, 504-505 (3d Cir. 2009)(remand is necessary where the ALJ failed to analyze a claimant's obesity in conjunction with her other impairments.)

The ALJ drew heavily on reports of Plaintiff's daily activities and other evidence in support of his conclusions; however, many of these citations were factually incorrect. At two

---

[16]

The Court notes that failure to discuss a majority of the psychological records and all of the medical records is also inappropriate in the step two analysis. The ALJ found no severe impairments, made no finding, and gave no explanation of his decision in this regard.

points in the opinion, the ALJ noted that Plaintiff cared for five children, her own three and two

for which she was a babysitter. (R. 72, 73). In reality, Plaintiff's three children were with her

ex-husband in Texas and were all adults by the date of the opinion. (R. 159-161). Reference

was also made to one document of the Office of Vocational Rehabilitation noting, "the fact that

the Office of Vocational Rehabilitation has found that the claimant is eligible for vocational

rehabilitation services is also indicative of the fact that the claimant has the capacity to perform

sustained work activity." (R. 73). The record noted, however, that the eligibility for the program

had not yet been determined, but neuropsychological testing had been ordered. In any respect,

eligibility for OVR is not appropriate evidence of the ability to work in and of itself. (R. 288).

It is evident that the residual functional capacity assessed by the ALJ and in turn, the

hypothetical question posed to the vocational expert were not supported by substantial

evidence. A significant portion of Plaintiff's medical records was ignored and other evidence

mischaracterized. As a result, this case will be remanded for proper consideration of the

evidence.

### D.      Weight Given to Treating Physician Reports

Plaintiff also argues that the ALJ failed to properly consider the opinions of her

treaters, Dr. Altman, Dr. Simmons, and Dr. Dischman. (Pl's Brief at 11-13). Dr. Dischman

opined that Plaintiff was temporarily disabled from January 5, 2006 to January 5, 2007 due to

bipolar disorder, depression, and asthma. (R. 232). Dr. Altman opined that Plaintiff had marked

limitations in her ability to make judgments of simple work-related decisions; interact

appropriately with the public; interact appropriately with supervisors and co-workers; respond

appropriately to work pressures in the usual work setting; and respond appropriately to changes

24

in a routine work setting. (R. 245-246). Dr. Simmons diagnosed major depressive disorder, recurrent, moderate and a GAF of 40, which is indicative of severe symptoms with some impairment in reality testing or serious impairment in other facets. (R. 298). Plaintiff argues that these opinions were entitled to controlling weight. (Pl.'s Brief at 13).

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 422, 429 (3d. Cir. 1999), (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). However, for controlling weight to be given to the opinion of a treating physician that opinion must be "well supported by medically acceptable clinical and laboratory diagnostic techniques and ... not inconsistent with other substantial evidence." 20 C.F.R. §§404.1527 (d)(2), 416.972 (d)(2). An ALJ may reject a treating physician's opinion outright on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. *Newhouse v. Heckler,* 753 F.2d 283, 286 (3d Cir.1985). There are several factors that the ALJ may consider when determining what weight to give the opinion of the treating physician. 20 C.F.R. §404.1527, 416.927 (d)(2). They include the examining relationship, treating relationship (its length, frequency of examination, and its nature and extent), supportability by clinical and laboratory signs, consistency, specialization, and other factors. 20 C.F.R. §404.1527 (d), 416.927 (d).

Generally, an ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent

medical evidence. *Fargnoli v. Massanari*, 247 F.3d 34, 37 (3d Cir. 2001). When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir.1993). The ALJ must consider all the medical evidence and give some reason for discounting the evidence he rejects. *Stewart v. Secretary of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983).

In the ALJ's opinion, he gave little weight to Dr. Dischman's statement that the claimant was temporarily disabled because it was "wholly and totally conclusory." (R. 71). He referred to Dr. Altman's records as an "overstatement" of the claimant's functional limitations and noted that they were inconsistent with the findings of Dr. Glover. (R. 73). Finally, he gave little weight to the psychological assessment of Dr. Simmons because it was inconsistent with Plaintiff's activities of daily living and his own finding that "claimant's treating sources should certainly have assessed the claimant with a much higher GAF score." (R. 74).

Clearly, the ALJ's decision to give little weight to the reports of treating source opinions required a more thorough discussion of the medical evidence and proper analysis of the factual circumstances. The ALJ's findings were conclusory and for the most part, did not rely on medical evidence. While Dr. Glover was a state agency physician entitled to some weight, he never examined Plaintiff. The records of Dr. Altman and Dr. Simmons were never discussed, and therefore, it was improper to make conclusions on them based on the assessments of Dr. Glover. In addition, the ALJ's opinion that "claimant's treating sources should certainly have assessed the claimant with a much higher GAF score" due to her daily activities is based on lay opinion and was improper. As noted above, this case will be remanded for reconsideration of this evidence.

26

### D.      New Evidence

Finally, Plaintiff argues that the decision of the ALJ should be reversed based on a subsequent decision of the SSA granting Plaintiff benefits. (Pl.'s Brief at 14-15 and Appendix "A"). Plaintiff also seemingly argues that, at the very least, remand is appropriate for the consideration of new evidence. *Id*. A significant amount of new evidence was submitted at the Appeals Council level including records of a third psychiatric hospitalization in July 2008, treatment in the emergency room for a panic attack and back pain in August 2008, a neurological consultation for back pain, progress notes from Dr. Dischman, and a medication management record from the Irene Stacey Mental Health Center. (R. 360-409).

An outright reversal based on a subsequent granting of benefits would be inappropriate. The evidence submitted in connection with Plaintiff's subsequent application for SSI was not before the ALJ when his decision was made. *See Szubak v. Secretary of HHS*, 745 F.2d 831, 833 (3d Cir. 1984); *Mikol v. Barnhart*, 554 F.Supp. 2d 498, 501-502 (S.D.N.Y. 2008). Since this case is being remanded on other grounds, the Court need not consider whether it should be remanded based on new and material evidence. The failure to consider medical evidence obtained after the decision was not the fault of the Commissioner; however, since the Court's disposition on this matter will give the ALJ a fresh opportunity to look at this case, this evidence should certainly be considered on remand.

### VI.      CONCLUSION

Based on the foregoing, Plaintiff's motion for summary judgment (Doc. No. [8]) is granted, in part, and denied, in part.  It is granted insomuch as it requests a remand not

inconsistent with this opinion and denied in all other respects.  Defendant's motion for

summary judgment (Doc. No. [13]) is denied.

       An appropriate Order follows.


                  BY THE COURT:

                  _s/Nora Barry Fischer_
                  Nora Barry Fischer
                  United States District Judge

Dated: March 23, 2010

cm/ecf:    All counsel of record.